IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| VICTORY PROCESSING, LLC, and DAVE DISHAW, | CV 17–27–H–CCL |
| Plaintiffs, | |
| vs. | ORDER |
| TIM FOX, in his official capacity as Attorney General for the State of Montana, | |
| Defendant. | |

Before the Court are cross-motions for summary judgment filed by the

parties. Having examined the entire record, the Court is prepared to rule.

## I. BACKGROUND

This is a declaratory judgment action claiming violation of Plaintiffs' civil

rights, 42 U.S.C. § 1983, by alleging a deprivation of Plaintiffs' right to free

speech guaranteed by the First and Fourteenth Amendments of the U.S.

Constitution. (ECF No. 1, Compl. ¶ 1.)

Plaintiff VPLLC is a limited liability company organized in 2012 in the State of Michigan, with offices in Grand Rapids, Michigan. (ECF No. 1, Compl. ¶ 1.) Plaintiff Dishaw is the managing member of VPLLC. (ECF No. 27, Dishaw Aff. ¶ 3.) Dishaw states that VPLLC "engages in political consulting and conducts data gathering and dissemination projects regarding political campaigns, election races, ballot initiatives . . . throughout the United States, primarily through the use of automated telephone calls." (ECF No. 27, Dishaw Aff. ¶ 5.)

Plaintiffs VPLLC and Dishaw assert that a Montana statute, Mont. Code Ann. § 45-8-216, enacted in 1991, deprives them of the ability to convey political messages to Montana voters. The statute provides that

(1) A person may not use an automated telephone system, device, or facsimile machine for the selection and dialing of telephone numbers and playing of recorded messages if a message is completed to the dialed number for the purpose of:
(a)     offering goods or services for sale;
(b)     conveying information on goods or services in soliciting sales or purchases;
(c)     soliciting information;
(d)     gathering data or statistics; or
(e)     promoting a political campaign or any use related to a political campaign.

2

(2) This section does not prohibit the use of an automated telephone system, device, or facsimile machine described under subsection (1) for purposes of informing purchasers of the receipt, availability for delivery, delay in delivery, or other pertinent information on the status of any purchased goods or services, of responding to an inquiry initiated by any person, or of providing any other pertinent information when there is a preexisting business relationship. This section does not prohibit the use of an automated telephone system or device if the permission of the called party is obtained by a live operator before the recorded message is delivered.

Mont. Code Ann. §45-8-216 (2017).

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations ... admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A), (B).

The summary judgment movant bears the initial burden as to the elements of the causes of action about which there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to establish the existence of a material fact. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a *genuine* issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e) (1963) (amended 2010)). A disputed fact raises a *genuine* issue for trial if it would permit a reasonable jury to return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must construe disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). However, bare assertions standing alone are insufficient to create material facts. *Liberty Lobby*, 477 U.S. at 247-48. If the burden shifts, the non-moving party must produce "significant

probative evidence," and "may not rely merely on the unsupported or conclusory allegations of [his] pleadings." *Coverdell v. Dep't of Soc. & Health Servs.*, 834 F.2d 758, 769 (9th Cir. 1987).

## III.  DISCUSSION

A.    STANDING.

Article III of the U.S. Constitution states the "case or controversy" requirement for subject matter jurisdiction. *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).  Plaintiffs' unverified Complaint asserts a First Amendment pre-enforcement challenge against Montana's robocalling statute.  Defendants challenge Plaintiffs' standing to present this claim because the claim rests on the legal rights and interests of others, and parties ordinarily do not enforce the constitutional rights of others.  In order to demonstrate third-party standing, Plaintiffs must show that they have (1) suffered an injury in fact, (2) have a close relation to the third party, and (3) the third party is hindered from protecting his or her own interests. *Wasson v. Sonoma County Junior College*, 203 F.3d 659, 663 (9th Cir. 2000) (citing *Powers v. Ohio*, 449 U.S. 400, 410-11,

111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)). Plaintiffs seem to meet the first two prongs of this test in that Plaintiffs may lose business and profits in Montana if they cannot send fully-automated political campaign robocalls to Montana residences (and can be fined if they do), and there is a contractual relationship between Plaintiffs and their political campaign customers. The Court does not see any hindrance, however, to the third party's ability to litigate this question directly, and Plaintiffs' refusal to divulge the name of any potential customer (on grounds of confidentiality) causes the Court to wonder somewhat about the nature and extent of such customer interest, if any. On the other hand, an obvious hindrance to obtaining customers willing to be named in a suit would be the Montana statute's prohibition itself.

Because of concerns regarding the "chilling effect of sweeping restrictions" on speech, the Supreme Court has endorsed pre-enforcement actions. *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). "It is sufficient for standing purposes that the plaintiff intends to engage in 'a course of conduct arguably affected with a constitutional interest' and that there is a

credible threat that the challenged provision will be invoked against the plaintiff."
*Italian Colors Restaurant v. Becerra*, 878 F.3d 1165 (9th Cir. 2018) (citing *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154-55 (9th Cir. 2000)).  The Court should consider "(1) the likelihood that the law will be enforced against the plaintiff, (2) whether the plaintiff has shown, 'with some degree of concrete detail,' that she intends to violate the challenged law; and (3) whether the law even applies to the plaintiff." *Italian Colors Restaurant*, 878 F.3d at 1172 (citing *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010)).

Clearly, Montana's robocalling statute applies to Plaintiffs' stated intent to send political campaign robocalls to Montana households.  Plaintiffs were incorporated in Michigan in 2012 and claim to have been engaged in selling robocall services outside of Montana.  Plaintiff claims to have had potential Montana clients decide against hiring Victory Processing because Montana's robocalling statute stands in the way.  Defendants point out that Plaintiff Dishaw's affidavit is devoid of facts relating to time, date, or specific instances of conduct as to either Plaintiff's intent to violate the law or as to Defendants' intent to

enforce the law. It is troubling that Plaintiffs refused to divulge any information during discovery that would have supported their alleged intention and opportunity to violate the law. Plaintiffs' refusal to divulge the names of any potential customers (on grounds of confidentiality) provides only a thin basis for standing, but the Court believes the law applies to Plaintiff's proposed robocalls, that the law arguably affects a constitutional interest, that Plaintiffs have shown an intention to violate Montana's robocalling law, and that it is likely Montana would enforce its law against Plaintiffs if Plaintiffs were to register, for example, with the State to conduct robocalling in Montana. *See infra* n. 1. Furthermore, self-censorship may suffice to state a sufficient injury "even without an actual prosecution." *Italian Colors Restaurant*, 878 F.3d at 1173 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988)). When a threatened enforcement implicates First Amendment rights, "the [standing] inquiry tilts dramatically toward a finding of standing." *LSO*, 205 F.3d at 1155. The Court finds that it is reasonable for Plaintiffs to modify their behavior to avoid violating this statute and to avoid a credible threat of its

enforcement.  Therefore, the Court concludes that Plaintiffs have established

standing to proceed with their Complaint.

B.      CAPACITY TO SUE UNDER MONTANA LAW.

Defendants argue that Montana's door-closing statute[1] bars Plaintiffs' claim.

However, Plaintiffs' Complaint is filed pursuant to 28 U.S.C. 1331 (federal

question jurisdiction).  Therefore Defendants' argument regarding Montana's

door-closing statute is not well taken.  *See Woods v. Interstate Realty Co.*, 337

U.S. 535, 538 (1949) (barring claim pursuant to state door-closing statute when

claim is brought pursuant to diversity jurisdiction).

C.      GOVERNMENTAL INTEREST.

Defendant Fox asserts that a compelling and long-respected government

interest is served by Montana's statutory prohibition on robocalls made to

nonconsenting parties.  Mont. Code Ann. § 45-8-216 .  "'The State's interest in

---

[1]  Mont. Code Ann. § 35-1-1027(1) provides that "[a] foreign corporation transacting business in this state without a certificate of authority [to transact business pursuant to M.C.A. §35-1-1206] may not maintain a proceeding in any court in this state until it obtains a certificate of authority."

protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.'" *Frisby v. Schultz*, 487 U.S. 474, 484, 108 S.Ct. 2495, 2502 (1988) (quoting *Carey v. Brown*, 447 U.S. 455, 471, 100 S.Ct. 2286, 2296, 65 L.Ed.2d 263 (1980)). "The First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech." *Id.* at 487, 108 S.Ct. at 2504. What is offensive speech includes speech that is disruptive and unwanted. In addition, "the home is different." *Id.*, 487 U.S. at 484, 108 S.Ct. at 2502.

In *Frisby*, the Supreme Court stated, "we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom." *Id.* Obviously, a door-to-door visitor may not put a foot in a doorway and insist upon making an unwanted presentation to a resident who has no desire to receive the solicitation. *See Kovacs v. Cooper*, 336 U.S. 77, 86, 69 S.Ct. 448, 453 (1949) (dicta). A visitor may not even knock or ring a doorbell when a no-solicitation sign is posted pursuant to statute or ordinance. *See Hall v. Commonwealth*, 188 Va. 72, 49 S.E.2d 369,

appeal dismissed, 335 U.S. 875, 69 S.Ct. 240, 93 L.Ed. 418 (1948).  Likewise, an

addressee can demand that the Postmaster stop delivering offensive mail from a

particular sender.  *Rowan v. Post Office Dep't*, 397 U.S. 728, 734, 90 S.Ct. 1484,

1489, 25 L.Ed.2d 736 (1970) (no-junk-mail list).  In all these circumstances, it is a

privacy right of any person to either decline or consent to any communication

utilizing one's own private property.  "Nothing in the Constitution compels us to

listen to or view any unwanted communication, whatever its merit...."  *Id.* at 737.

Likewise, it is a privacy right for a person to be able to also request that no further

communication be made, thereby reducing the number of future interruptions.  As

the Supreme Court stated in *Rowan* regarding receipt of unwanted mail--and just

as applicable to the receipt of unwanted robocalls or doorstep solicitations-- "[i]n

today's complex society we are inescapably captive audiences for many purposes,

but a sufficient measure of individual autonomy must survive to permit every

householder to exercise control over unwanted mail."  *Id.* at 736, 90 S.Ct. at 1490.

"There is simply no right to force speech into the home of an unwilling listener."

*Frisby*, 487 U.S. at 485, 108 S.Ct. at 2503.  Our respect for the privacy of the

residence and desire for freedom from unwanted household intrusions ("the right

to be left alone") is traditional and time-honored.  The federal "Automated

Telephone Consumer Protection Act of 1991 ("TCPA"), Pub. L. No. 102-243, 47

U.S.C. § 227, *et seq.*, prohibited robocalls to cellphones and the use of prerecorded

voice messages to residential lines without the permission of the recipient.  In its

legislative history, it is stated that

> [t]he reported bill will result in a significant benefit in protecting the
> personal privacy of residential telephone subscribers.  The evidence
> gathered by the Committee indicates that a substantial proportion of
> the public believes that these calls are a nuisance and an invasion of
> one's privacy rights in the home.  The Supreme Court has recognized
> explicitly that the right to privacy is founded in the Constitution, and
> telemarketers who place telephone calls to the home can be
> considered "intruders" upon that privacy.

(ECF No. 30-3, Senate Report 102-178 (Oct. 8, 1991).)  (The parties do not

address robocalls to cell phones primarily because the TCPA requires written or

oral consent for robocalls to cell phones.)  The government interest at issue is one

of the pillars of civil society, and so this Court agrees with the Defendants that

governmental protection of residential privacy is a compelling government

interest.  *See also, Brickman v. Facebook, Inc.*, 230 F.Supp.3d 1036, 1046 (N.D. Cal. 2017) (holding in TCPA case that protection of residential privacy is a compelling interest); *Holt*, 240 F.Supp.3d 1021, 1033 (N.D. Cal. 2017) (same).

The common thread among Montana's prohibited robocalls appears to be that all of the conduct listed in subsection 216(1)(a)-(e) is performed for the primary benefit of the sender of the message and not for the primary benefit of the recipient of the message.  Furthermore, in each instance, the sender of the robocall and the recipient are strangers to each other.  The third common thread between the subsection 216(1)(a)-(e) conduct is the recipient's lack of prior consent for the robocall.  Notably, all these prohibited robocalls are permitted under the statute when the call is introduced by a live operator.

And there are exceptions to the live operator requirement.  The common thread for the exceptions granted in subsection 216(2) is that the excepted robocalls provide information that recipients clearly wish to receive because it is of benefit to them.  For example, such robocalls notify the recipient that an item previously ordered is now in stock; an item previously ordered is available for

delivery or pickup; or an expected package delivery is delayed by bad weather, etc. All such robocalls rely on a pre-existing business relationship between the parties and are also made for the primary benefit of the recipient. The third common thread is that these calls can be fairly deemed to be supported by implied consent.

Very significantly, subsection (2) of § 45-8-216 provides a global exception such that *any* prohibited robocall can be made legal under Montana law simply by prefacing the robocall with a live operator who obtains the recipient's permission for the playing of the recorded message. Not only can a recipient then decline to receive that message, but also the recipient can request that no further calls be made, thereby reducing the number of interruptions in the future.

Surveying the entire statute as a whole, the Court finds that it is organized in a logical and consistent fashion. The common thread running throughout the statute is that robocalls are prohibited without actual or implied consent. Robocalls made within the context of a preexisting relationship *and* made for the primary benefit of the recipient are not prohibited by this statute and do not

require a live operator.  In addition, robocalls made pursuant to actual consent are

not prohibited.  Only robocalls lacking in actual or implied consent are prohibited,

and this prohibition has absolutely nothing to do with the content of any of those

messages.   In other words, the *justification* for the facially content-based

discrimination holds up because there is no underlying discriminatory intent and

the government's interest in protecting privacy is compelling.

Plaintiffs argue that protection of residential privacy is not a compelling

government interest and claims that it has not been found to be so by any court,

except perhaps for the two lower court cases in *Brickman* and *Holt*.  However, the

Fourth Circuit did assume in *Cahaly*, a case relied upon by Plaintiffs, that the

government interest in protecting residential privacy and tranquility is a

compelling one.  *See Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015).  The

phrase, 'a man's home is his castle' (anachronistic as it may be), reflects the long-

standing societal and common-law tradition that prizes and protects residential

privacy and tranquility.  In *Patriotic Veterans, Inc. v. Zeller*, 845 F.3d 303, 305

(2017), wherein a content-neutral robocall statute requiring express consent/live

operator was upheld under intermediate scrutiny as a reasonable manner restriction, it is very well stated that "[e]very call uses some of the phone owner's time and mental energy, both of which are precious." This Court cannot subscribe to Defendant's argument that a government interest that is "certainly of the highest order in a free and civilized society" is not also a compelling government interest. *See Frisby*, 487 U.S. at 484, 108 S.Ct. at 2502.

D.     CONTENT NEUTRALITY.

VPLLC and Dishaw argue that the 45-8-216(1)(e) prohibition on robocalls promoting a political campaign or any use related to a political campaign is not content neutral. They point to the statute itself: subsection 216(1)(e) explicitly states that robocalls "promoting a political campaign or any use related to a political campaign" are prohibited (if not introduced by a live operator as provided in subsection 216(2)).

There can be no doubt that Montana's robocall statute is content-based. The statute targets five types of speech (commercial sales, commercial advertising, surveys and polling, and campaigning) for differential treatment than other types

of speech. Pursuant to *Reed v. Town of Gilbert, Ariz.*, 135 S.Ct. 2218, 2230

(2015), a statute that identifies particular topics and subject matter for differential

regulation is facially content-based. This Court therefore distinguishes *Bland v.

Fessler*, 88 F.3d 729 (9th Cir. 1996), and *Gresham v. Picker*, 214 F.Supp.3d 922

(E.D. Cal. 2016), both of which analyzed the California robocall statute pursuant

to intermediate scrutiny, because in those cases, the California robocall statute did

not single out political subject matter for special restrictions in the way that

Montana's robocall statute does.

However, it is clear that Montana's content-based identification of subject

matter is not intended to suppress discussion of the topic or of any viewpoint. A

proliferation of campaign robocalls could lead easily to a veritable arms-race of

political campaign robocalls and cause the exact privacy problem that the Montana

statute is designed to prevent: the annoyance and harassment of Montanans in

their households–an invasion of the close. Indeed, Plaintiffs analyze the political

campaign speech prohibition in subsection (1)(e) by ignoring the rest of the

statute. Taken altogether, the entire statute demonstrates that it is not organized by

17

the content of speech at all, but instead is organized whether or not the robocalls

are consented to by the recipient. Whether this statute is content based or content

neutral is thus a closer question that might first appear, but this Court concedes

that the Montana statute is content-based under the Supreme Court's holding in

*Reed.*

      While not disregarding the content-based nature of the Montana robocall

restriction, the Court also considers whether the justification for the statute is

content based or content neutral. The Supreme Court has defined content

neutrality as follows: "A regulation that serves purposes unrelated to the content

of expression is deemed neutral, even if it has an incidental effect on some

speakers or messages but not others. Government regulation of expressive activity

is content neutral so long as it is 'justified without reference to the content of the

regulated speech.'" *Ward*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754 (quoting *Clark*

*v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065,

3069, 82 L.Ed.2d 221 (1984) (internal citations omitted)). The Montana robocall

statute does pass the *Ward* justification test because its purpose is actually content

neutral.

The justification for Montana's robocall statute is the compelling government interest in residential privacy and tranquility. Montana's robocall statute has no "disagreement with the message [a political robocall] conveys." *Ward*, 491 U.S. at 791, 109 S. Ct. at 2753-54. The general prohibition on robocalls between strangers without consent, even as applied to political speech, carries with it no "scent of government favoritism in the free market of ideas." *Bland*, 88 F.3d 729, 734 (9th Cir. 1996). It is clear that the statute categorizes political messages on an equal footing with the other named categories of messages (sales, advertisements, polling, and data gathering), and that the salient characteristics of these messages are that they are (a) unconsented, (b) between strangers, and (c) primarily of benefit to the sender, not the recipient. In addition, the section 216(a)(1)-(e) categories make up the bulk of robocall communications.

On the other hand, the subsection 216(2) messages that are exempt from the live-operator requirement are those messages arising in the context of (a) implied consent, (b) a preexisting relationship, and (c) primarily of benefit to the recipient,

not the sender.  These exceptions to the general robocalling rule make up a much

smaller group of communications.  Therefore, the manner in which the Montana

statute draws a bright line between the two groups is not organized by the *content*

of the messages, but divides along the characteristics of consenting, pre-existing

relationships.

Plaintiffs cite *Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015), and *Reed v.*

*Town of Gilbert, Ariz.*, to support their allegation that Montana's robocall statute

is content based.  In *Cahaly*, a South Carolina anti-robocall statute prohibited

robocalls "of a political nature," and a Fourth Circuit panel held that this was a

content-based restriction that was not narrowly tailored to the compelling

governmental interest in "protecting[ing] residential privacy and tranquility from

unwanted and intrusive robocalls."  *Id.* at 405.  However, the statute defined a

robocall as calls not introduced by a live operator.  S.C. Code Ann. § 16-17-

446(A).  Still, the South Carolina's robocall statute explicitly prohibited all

political campaign robocalls unless the recipient had made an express request for

it.  Commercial robocalls were also prohibited by the South Carolina statute, but

more generous exceptions were allowed for this type of speech: robocalls for debt collection and calls arising from business relationships were permitted.

The South Carolina statutory scheme explicitly targeted robocalls of a political nature. Furthermore, in applying strict scrutiny, the Fourth Circuit panel found that the South Carolina statute was overinclusive, underinclusive, and not narrowly tailored because many less restrictive alternatives were available other than a nearly complete prohibition. *Id.* at 405.

That statutory scheme differs in some ways from Montana's M.C.A. § 45-8-216. Political robocalls are permitted--as are all Montana robocalls--with a live operator. Unlike South Carolina's statute, which addresses only two categories of robocalls, Montana's statute identifies five different categories of robocalls that together comprise the vast majority of robocalls, and Montana's entire statutory scheme functions consistently, logically, and independently of any message content or topic preference to promote a compelling government interest.

This Court also distinguishes *Gresham v. Rutledge*, 198 F.Supp.3d 965, 970 (E.D. Ark. 2016) (holding that the Eleventh Amendment bars a claim for money

damages in a § 1983 suit by a political consultant who sells robocalling services),

because the Arkansas robocall statute addressed by that case did not provide the

live-operator option that is permitted in Montana.  This Court also disagrees with

the *Rutledge* finding that protection of residential privacy is not a compelling

governmental interest.  *Rutledge* relies for that conclusion on *Carey v. Brown*, 447

U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980), which merely held--as a denial

of equal protection--that a law prohibiting street and sidewalk picketing of

residences and dwellings (for the stated purpose of protecting residential privacy),

but at the same time exempting labor picketing of places of employment, unfairly

discriminated between types of speech in a public forum.

Both *Cahaly* and *Rutledge* rely on *Reed v. Town of Gilbert, Ariz.*, 135 S.Ct.

2218, 192 L.Ed.2d 236 (2015), for the proposition that a statute which *describes*

particular types of subjects for communication is content-based on its face and

must automatically receive strict scrutiny.

The Town of Gilbert, Arizona, passed a Sign Code that prohibited any

outdoor sign without a permit, but gave exemptions for 23 categories of signs,

including "Ideological Signs," "Political Signs," and "Temporary Directional Signs Relating to a Qualifying Event." *Id.* at 2224. Surprisingly, it was the latter exemption that was at the heart of the controversy in *Reed*.

These exempted categories of signs were permitted by the Sign Code, but only with strict conditions attached. For example, Ideological Signs could be 20 feet square and could be placed anywhere and for any amount of time. Political Signs could be 16 square feet on private property and 32 square feet on nonresidential property but limited as to time for 60 days before a primary up until 15 days after a general election. Receiving the most restrictive treatment, a "Temporary Directional Sign" could be allowed, but no more than four such signs, no bigger than six square feet, on a particular property; furthermore these temporary directional signs were permitted from no more than 12 hours before and 1 hour after the qualifying event.

In fact, at the beginning of the *Reed* litigation, which was brought by Pastor Reed on behalf of his congregation at the Good News Community Church, this exemption was originally titled "Religious Assembly Temporary Direction Signs,"

and it was directed specifically at religious congregations that had no fixed place of worship. When Pastor Reed's litigation was first filed against the Town of Gilbert, these directional signs could be placed no more than 2 hours before and one hour after the religious services, which posed a severe problem for Pastor Reed because his congregation did not know where the service would be held until the signs went up. This is content-based regulation because it "singles out specific subject matter for differential treatment, even if it does not target viewpoints within that subject matter." *Reed*, 135 S.Ct. at 2230.

Although not plainly discussed as a case of religious discrimination, the strict scrutiny accorded in *Reed* was plainly warranted on multiple grounds. The content-neutral justification given by the Town of Gilbert for its noticeably stricter treatment of an itinerant church group was simply belied by the town's very restrictive treatment of that same group. In *Reed*, the facially content-based nature of the statute actually did disclose at least the scent of discriminatory animus underlying a superficially neutral justification. This Court distinguishes *Reed* on that basis, because that type of underlying discrimination against an entire group

24

or an entire subject matter or a viewpoint is not present in this case.

E.      LEVEL OF SCRUTINY.

It seems to this Court that a reasonable manner restriction on speech in a private forum should receive intermediate scrutiny if the governmental justification for the restriction is genuinely content neutral.[2]  That is certainly the case here, and the Court finds that all the intermediate scrutiny factors are satisfied

---

[2]  Under intermediate scrutiny, a content-neutral governmental speech restriction (a noise ordinance) of a public forum (a public band shell) is permissible as to reasonable time, place, or manner restrictions.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989).  Intermediate scrutiny means that because the content of the speech itself is not being regulated, the Court should focus its review on the reasonableness of the time, place, or manner of the regulation.  The five-factor test for this review is (1) whether the regulation is within the constitutional power of a government; (2) whether the restriction furthers an important or substantial governmental interest; (3) whether the governmental interest is unrelated to the suppression of free expression; (4) whether the regulation is narrowly tailored (*i.e.*, is no greater than is essential to the furtherance of the governmental interest); and (5) whether the regulation leaves open ample alternative channels of communication.  *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968) (factors 1-4); *Ladue v. Gilleo*, 512 U.S. 43, 56, 114 S.Ct. 2038, 2046, 129 L.Ed.2d 36  (1994) (finding that ordinance prohibiting residential signs eliminates an important medium of speech).

by the Montana robocall statute.  However, the Court is mindful of the Supreme

Court's insistence in *Reed v. Town of Gilbert, Ariz.,* that a facially content-based

statute must receive strict scrutiny regardless of the genuine nature of the content-

neutral justification.  Therefore, the Court will utilize a traditional strict scrutiny

analysis.

A governmental speech restriction that is content-based must meet strict

scrutiny.  *Reed*, 135 S.Ct. at 2231.  Although this is rare, it is certainly possible.

*See Williams-Yulee v. Florida Bar*, 135 S.Ct. 1656, 1666, 191 L.Ed.2d 570 (2015)

(campaign speech of judicial candidate properly restricted to serve a compelling

government interest).  Strict scrutiny requires that a government's restriction on

speech further a compelling government interest and be narrowly tailored to

achieve that purpose.  *Reed*, 135 S.Ct. At 2231 (citing *Arizona Free Enterprise*

*Club's Freedom Club PAC v Bennett*, 131 S.Ct. 2806, 2817, 180 L.Ed.2d 664

(2011)).  There are other requirements.  For example, a less restrictive alternative

that meets the government's purpose ought to be utilized, *see United States v.*

*Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865

(2000), but on the other hand the "least restrictive or least intrusive means" is not required, *see Bland v. Fessler*, 88 F.3d at 736 (citing *Ward*, 491 U.S. at 798, 109 S.Ct. at 2757-58) . The governmental restriction must not be overinclusive by restricting protected speech unnecessarily, and it must not be underinclusive by leaving "appreciable damage to [the government's] interest unprohibited." *Cahaly*, 796 F.3d at 405 (internal citations omitted).

F.      TIME, PLACE, MANNER RESTRICTION.

As explained by the Ninth Circuit in *Bland v. Fessler*, 88 F.3d 729, 733 (9th Cir. 1996), the live-operator requirement is a *manner* restriction. The purpose of the restriction is to give control over the playing of the recorded message to the recipient, who can further request that no future calls be made. The underlying purpose of this restriction is to protect the privacy and tranquility of the person receiving the robocall. The statutory exemption that is provided to established business relationships is content neutral and consistent with the overall scheme because the preexisting relationship supports a finding of implied consent.

G.      NARROWLY TAILORED.

27

Having determined that Montana's robocall statute is content based, but that the it serves a compelling governmental interest, the next question is whether the statute is narrowly tailored to address that governmental interest. First, it is clear robocalls are by and large permissible in most contexts in Montana. The statute narrowly tailors to the governmental interest in protecting the peace and tranquility of the household by requiring, in most instances, that a live operator give control over the message to the recipient for the purpose of consenting, declining, or asking to be taken off the calling list. Only calls fairly categorized as being between related parties, and for which implied consent can reasonably be inferred, are relieved of the live-operator requirement, and therefore the Montana statute is not underinclusive.

There is not a less restrictive alternative that would serve Montana's purpose. For example, a time-of-day restriction (*e.g.*, before 8:00 a.m. and after 9:00p p.m.) is a minimal benefit when householders (such as infirm persons who may have trouble getting to a phone, mothers with small children, and people working in their homes, to name just a few categories) are exposed to automated

calls for twelve or more hours each day.  Likewise, a recording disclosing a

caller's identity is cold comfort for a blaring recorded message that is unwanted,

and do-not-call lists are notoriously ineffective.  The Montana statute is therefore

not overinclusive because all of the robocalls that are reasonably likely to be

unwelcome are covered by the statute; the Montana statute is not underinclusive

because the few categories of calls not restricted by the live-operator requirement

are reasonably understood to have implied consent and therefore need no

restriction.

H.    ALTERNATIVE MEANS OF COMMUNICATION AND LESS
      RESTRICTIVE ALTERNATIVE REQUIREMENTS.

There are two additional aspects to the overinclusive/underinclusive narrow

tailoring question.  First, the restriction "must leave open ample alternative

channels for communication of the information."  *Clark v. Community for*

*Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221

(1984).  Second, the restriction must be no more restrictive than necessary to serve

the governmental interest, but it need not be the least restrictive or least intrusive

means possible.  *Ward*, 491 U.S. at 788-89, 109 S.Ct. at 2758.  Montana's

robocalling statute still leaves ample means of communication for individuals and

organizations.  Advance permission for robocalls can be obtained from donors and

potential donors.  Use of a live operator to introduce the recorded message may be

an option.  An alternative is to use live operators to communicate the entire

message.  There are many other channels of communication.  There is leafletting

and pamphleting of residences and street corners.  There are billboards, posters,

and yard signs.  Bulk mailing is available.  Internet and other media provide

enormous opportunities for bulk message distribution.  Obviously there are ample

alternative channels for Plaintiffs' communications.  Because a live-operator

requirement is less restrictive than a complete prohibition while still serving the

government's interest as no other less restrictive alternative can do, the "less

restrictive alternative" requirement is satisfied.

## IV.  CONCLUSION

A telephone system generally, and certainly a residential telephone in

particular, is a privately-owned means of communication.  We are not examining a

traditional public forum where content-based restrictions examined with strict scrutiny would generally weigh against constitutionality. The uses for a private communications facility should be determined in the first instance by the choices made by the owner of that private property. In the context of robocalls, Montana's statutory restrictions on robocalls are intended to preserve, not diminish, the private property owner's control over his or her property and personal choices regarding receipt of communications, both of which are integral elements of residential privacy.

Political speech is precious under the First Amendment. The prohibition here of the promotion of a political campaign must meet a high bar to survive this challenge. It does so on its face by exempting robocall use if the permission of the called party is obtained by a live operator before the recorded message is delivered. It is this permission which is the saving grace of the Montana statute in this facial challenge.

The Court concludes that Montana's robocall statute is a constitutionally permissible content-based regulation of speech. The governmental interest

advanced by the statute is the compelling interest in protecting residential privacy and tranquility. The Montana statute is narrowly tailored to that government interest by preserving control and choice for the householder and leaving ample alternative (including all of the more traditional) channels of communication for the protected political speech. Accordingly,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (ECF No. 28) is GRANTED, and Plaintiff's Motion for Summary Judgment (ECF No. 24) is DENIED. Plaintiffs' Complaint and this action are both DISMISSED, and all relief is denied. Let judgment enter.

Dated this 9th day of February, 2018.


CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE